### IN THE UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF ARKANSAS
### HOT SPRINGS DIVISION

IN RE: JONATHAN MICHAEL YOUNG, DEBTOR          CASE NO.: 6:08-bk-70230
                                                                                        CHAPTER 13


JONATHAN YOUNG                                                                    PLAINTIFF

V.                                    AP NO.: 6:10-ap-07215

KRISTALYNN YOUNG                                                            DEFENDANT

### <u>MEMORANDUM OPINION</u>

Jonathan Young, the debtor ("debtor"), filed his *Complaint* on December 30, 2010, and *Amended Complaint* ("Complaint") on January 5, 2011, seeking damages and injunctive relief against his ex-wife, Kristalynn Young, now Kristalynn Stephens ("Stephens"), for violation of the automatic stay.  The gravamen of the Complaint concerns Stephens's postpetition efforts in state court to hold the debtor in contempt for failure to pay a prepetition judgment for attorney's fees and restitution as well as postpetition alimony.  Trial concluded on April 22, 2013.  Thereafter, the court took this matter under advisement.

For the reasons stated below, the relief requested in the Complaint is denied in part and granted in part.  The debtor did not introduce sufficient evidence to warrant injunctive relief.  The debtor did prove a willful violation of the automatic stay and is entitled to nominal damages of $250 and attorney's fees of $500.  Additionally, the court will issue an order directing Kathy A. Cruz to show cause why she should not be sanctioned pursuant to Federal Rule of Bankruptcy Procedure 9011 and directing the debtor to show cause why his case should not be dismissed for cause pursuant to 11 U.S.C. § 1307, including section 1307(c)(11).

1

## I. Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (C), and (O).  The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II. Findings of Fact

After the debtor filed bankruptcy, Stephens sought to collect prepetition attorney's fees, restitution, and postpetition alimony in the Circuit Court of Garland County, Arkansas ("Circuit Court").  Her efforts resulted in the debtor's incarceration.  Stephens concurrently sought payment of the same pre- and postpetition domestic support obligations in the debtor's bankruptcy case.  The debtor responded in a manner inconsistent with the United States Bankruptcy Code's ("Code") statutory scheme concerning the treatment of domestic support obligations.

The debtor also alleges a willful violation of the automatic stay.  As a complete defense, Stephens interposes a broad order lifting the automatic stay, which the debtor's counsel approved, that arguably permitted her to aggressively pursue the debtor.  Both the Circuit Court and the Arkansas Court of Appeals favorably concurred with Stephens's interpretation of the order lifting the stay.  The debtor disagrees and now seeks damages.

### A.  Divorce–Pre-Bankruptcy

The Honorable Marcia R. Hearnsberger ("Judge Hearnsberger") entered a *Decree of Divorce* ("Decree") granting the Youngs' divorce on November 1, 2007.  (Debtor's Ex. 41.)  Three provisions of the Decree are pertinent to the subsequent order lifting the stay, the debtor's initial and modified plans, and the contempt that resulted in this adversary proceeding.

2

Specifically, the Decree ordered the debtor to pay Stephens (1) $1100 a month in alimony beginning September 2007, subject to review after one year; (2) $10,890 in attorney's fees and costs at $300 a month beginning October 2007; and (3) $2350 in restitution for wedding rings at $100 a month beginning October 2007.  (Debtor's Ex. 41 at 2.)

The debtor promptly failed to comply with the Decree.  In January 2008, Judge Hearnsberger briefly jailed the debtor for contempt for, inter alia, missed alimony payments. The debtor's parents immediately posted a $5000 bond that secured his release.

The debtor appealed the Decree and the subsequent contempt.  The appeal continued during the bankruptcy discussed below and occasioned Stephens's request for relief from the automatic stay.

### B.  Bankruptcy

On January 24, 2008, shortly after his first experience in jail, the debtor filed a voluntary Chapter 7 case.  (Ch. 7 Vol. Pet., Jan. 24, 2008, ECF No. 1.)  The debtor's original Schedule E listed the prepetition November 2007 "Judgment" (actually the Decree) for attorney's fees of $10,890 and restitution of $2350.  (Pet. 22, ECF No. 1.)  Each obligation was listed as a priority debt under section 507(a)(1).  The debtor's Schedule E did not contain any reference to alimony. (Pet. 22, ECF No. 1.)  On his Schedule J, the debtor itemized his $1100 monthly alimony payment to Stephens as an ongoing expense. (Pet. 28, ECF No. 1.)

By the January 2008 filing date, five months of alimony, or $5500, had accrued ($1100 for September 2007 through January 2008).  The full restitution and attorney's fee awards remained outstanding.  The $5000 bond, posted by the debtor's parents and released to Stephens on February 7, 2008, satisfied all but $500 of the prepetition accrued alimony.  (Debtor's Ex. 44; Debtor's Ex. 46 at 69.)

3

1.  Motion to Lift Stay

Sherry Daves ("Daves"), representing Stephens, filed a *Motion for Relief from Stay*

("Stay Motion") on May 6, 2008.  (Debtor's Ex. 3.)  The Stay Motion provided in pertinent part:

> 5.  A subsequent hearing on a petition for contempt for nonpayment by the Debtor was held in Circuit Court, and the Debtor appealed the Circuit Court's ruling against him.  A transcript and brief have been filed in the Court of Appeals and the time is approaching for the Creditor, Kristalynn Young, to file her brief before the Appellate Court.
>
> 6.  The Creditor, Kristalynn Young, seeks relief from stay from the Bankruptcy Court to pursue her State Court remedies.
>
> 7.  The stay provision of 11 U.S.C. § 362 of the Bankruptcy Code should be relaxed with regard to this Creditor with a valid claim or interest in and to the subject property and she should be released to pursue her ususal lawful remedies against the Debtor.
>
> WHEREFORE, the Movant/Creditor prays that this Court will order that relief from the automatic stay be granted so that the Movant/Creditor, and her successors and assigns, may pursue her lawful State Court remedies, and for all other just and proper relief to which she may be granted.

(Debtor's Ex. 3 at 2.)

Kathy A. Cruz ("Cruz"), representing the debtor, filed a *Response to Motion for Relief*

*from Stay* ("Response"), which provided in pertinent part:

> 7. The Debtor denies that the Creditor should be granted relief from stay as to a valid interest in property, as no property subject to 11 USC 362(k) has been identified that would require relief from stay, and obligations in the form of a domestic support order require no relief from stay.
>
> 8. Pleading affirmatively, the Debtor states that 11 USC 362(k) does not require the Creditor to obtain relief from stay to file appropriate pleadings with the Arkansas Court of Appeals, *and that to grant relief from stay to allow the Creditor carte blanche state court remedies is overly broad.*[1]

(Resp. to Mot. for Relief from Stay 1–2, May 22, 2008, ECF No. 28.) (emphasis added).

---

[1] The Response references section 362(k) in original.

4

The bankruptcy court held a hearing on the Stay Motion on June 18, 2008. Daves appeared on behalf of Stephens; Cruz appeared for the debtor. Cruz advised the court that the debtor had appealed a domestic matter, that she had agreed to a lifting of the stay, and that Daves would "go ahead and draft a very specific type order allowing that to happen." (Debtor's Ex. 6 at 3.) The bankruptcy court, the Honorable Ben T. Barry ("Judge Barry") presiding, replied: "Very good. That's what I sensed, that you all were both in agreement as to limiting the stay to be modified solely to the appeal and not a carte blanche type approach to all state remedies. And I think -- I think that's right. And everyone is in agreement." (Debtor's Ex. 6 at 3.) Judge Barry indicated he would sign the precedent if both counsel signed off on it. (Debtor's Ex. 6 at 3.)

Despite the specific concern raised in the Response and her representations to the court, Cruz approved an expansive order more consistent with the original Stay Motion. (Debtor's Ex 7.) The *Order* ("Stay Order"), entered June 25, 2008, provides as follows:

> The parties announced that pending matters had been settled. Accordingly, it is hereby Ordered that the Motion for Relief from Stay is granted for the purpose of allowing the parties to file pleadings with the Arkansas Court of Appeals or to seek state court remedies that are not inconsistent with any ruling issued by the Arkansas Court of Appeals in the underlying Circuit Court proceeding. This Order shall continue in effect should the Debtor convert his case to a Chapter 13 Bankruptcy.

(Debtor's Ex. 7.)

### 2. Conversion to Chapter 13 and Plan Confirmation

The debtor converted his case to a Chapter 13 on July 1, 2008. (Order and Notice Regarding Conversion, July 1, 2008, ECF No. 35.) The debtor's initial plan, filed July 17, 2008, did not reference or provide for Stephens. (Stephens's Ex. 1.)

The Chapter 13 Standing Trustee objected to the debtor's initial plan on several grounds. Pertinent to this adversary proceeding, the trustee raised the debtor's failure "to provide proof

5

that [he had] paid all amounts required to be paid under a domestic support obligation that first [became] payable after the date of the filing of the petition."  (Obj. to Conf. of Plan, Aug. 21, 2008, ECF No. 48.)  Stephens, on August 21, 2008, also objected to the debtor's initial Chapter 13 plan.  (Debtor's Ex. 10.)  Specifically, she alleged that the plan failed to address alimony of $1100 per month, attorney's fees and costs of $10,890, and restitution of $2350.  (Debtor's Ex. 10 at 1.)  She also asserted that, despite listing it as a monthly expense in his Schedule J, the debtor had not made his alimony payments on an ongoing basis. (Debtor's Ex. 10 at 1.)

While the initial proposed plan and objections remained outstanding, the Arkansas Court of Appeals (discussed in more detail below) affirmed the Circuit Court's decision in Stephens's favor on September 3, 2008 (the "Appellate Ruling").  (Debtor's Ex. 43 at 6.)  Relying on the Appellate Ruling and the Stay Order, Stephens corresponded with the debtor on October 6, 2008. (Debtor's Ex. 44.)  According to Stephens, the debtor was $14,300 in arrears in alimony payments representing October 2007 through October 2008.  (Debtor's Ex. 44 at 1.)  She advised the debtor that she needed "assurances by 10/10/08 at noon that [he would] deliver this by 10/31."  (Debtor's Ex. 44 at 1.)  The letter clearly stated that an inadequate response by Friday, October 10, 2008, would result in Stephens asking her attorney to proceed with filing contempt charges against the debtor.  (Debtor's Ex. 44 at 1.)

Neither the debtor nor Cruz reacted to this correspondence with an assertion that the contact, including the threat of contempt, constituted a violation of the stay.  Rather, the debtor reacted by amending his schedules and plan on October 8, 2008, to include the accrued postpetition alimony.  (Debtor's Exs. 12, 15.)

The debtor amended his Schedule E to include $9300 in alimony, along with the previously scheduled $10,890 in attorney's fees and $2350 in restitution, as an unsecured priority

claim under section 507(a)(1).  (Debtor's Ex. 13 at 3.)  The debtor also amended his Schedules I and J.  (Debtor's Ex. 15.)  By reducing expenses, he projected a monthly net income of $465.  (Debtor's Ex. 15 at 2.)  The debtor's amended Schedule J continued to list his monthly alimony expense of $1100.  (Debtor's Ex. 15 at 2.)  Yet, the debtor did not, during the entire course of his bankruptcy case, make his alimony payments directly to Stephens.

The debtor's October 8, 2008 *Modification of Chapter 13 Plan* ("Modified Plan") increased the debtor's monthly plan payment to the trustee from $100 to $465.  (Debtor's Ex. 12 at 2.)  The Modified Plan also addressed alimony of $9300, attorney's fees of $10,890, and restitution of $2350 as debts to be paid in full during the life of the plan through pro rata monthly payments.  Applying the $5000 bond paid by the debtor's parents to the $14,300 in alimony arrearages resulted in an alimony balance as of October 2008 of $9300.  All but $500 of the $9300 balance accrued postpetition.

The Modified Plan characterized the $9300 as "past due alimony" to be paid in full during the life of the plan.  (Debtor's Ex. 12 at 1.)  Further, the debtor would "continue to pay his current monthly alimony of $1,100.00 to [Stephens] direct."  (Debtor's Ex. 12 at 1.)  The term "continue" is misleading as the debtor had not been and did not "continue" making those payments.  Further, the alimony was not "past due" prepetition.  The alimony, or at least $8800, was past due postpetition.  The debtor deftly blended these two concepts not only in the Modified Plan but also in his Complaint, in which he alleges "[he] was to have been incarcerated for 30 days or pay a bond of $8,200 for alimony arrearages that were included in the chapter 13 plan as *pre-petition* alimony." (Compl. 6, Jan. 5, 2011, AP ECF No. 3.) (emphasis added).  Both the Modified Plan and the Complaint inaccurately characterized postpetition accrued alimony as prepetition.

7

By an order entered on October 27, 2008, Stephens withdrew her August 21, 2008 objection to the initial plan. (Order to With. Obj. to Conf., Oct. 27, 2008, ECF No. 80). However, on October 31, 2008, she promptly filed an objection to confirmation of the Modified Plan. (Debtor's Ex. 17.) The objection related to the direct payment of alimony. (Debtor's Ex. 17 at 1.) Stephens requested that the alimony be paid to and through the trustee's office because the debtor was not making his payments directly. The objection was set for hearing on November 19, 2008, but was continued to January 21, 2009.[2] (Debtor's Ex. 1.)

At the confirmation hearing held January 21, 2009, Daves announced that the October 31, 2008 objection would be voluntarily withdrawn. An order to that effect was entered on February 9, 2009. (Debtor's Ex. 21.) Stephens did not attend the hearing and testified that she did not know why Daves withdrew the objection. Although Stephens withdrew her objection to the Modified Plan, confirmation did not immediately follow. Two modifications and well over two years would pass from the January 21, 2009 hearing until a confirmation order was entered on April 6, 2011. (Debtor's Ex. 38.)

The debtor filed an amended plan on March 5, 2009 ("Second Modified Plan"), redundantly providing that the plan payments would be increased to $465 a month. All other provisions remained the same. (Mod. of Ch. 13 Plan, Mar. 5, 2009, ECF No. 109.) But, as noted on the trustee's March 16 and March 19, 2009 objections to the Second Modified Plan, the debtor still had not provided the trustee with proof that he had paid his postpetition domestic support obligations. (Stephens's Ex. 5; Debtor's Ex 26.) This basis was a consistent and recurring theme in the trustee's objections. (See, e.g., Stephens's Ex. 4.)

---

[2] As will be discussed below, on November 12, 2008, Stephens filed her motion in Circuit Court to hold the debtor in contempt for failing to pay alimony.

The debtor and the trustee collectively asked for or consented to seventeen requests to continue the confirmation hearing.  (Debtor's Ex. 1.)  The trustee's objection−based on the debtor's failure to provide proof of payment of postpetition domestic support obligations− remained unresolved during that period.  Finally, on March 22, 2011, the debtor filed a *Modification of Chapter 13 Plan* ("Third Modified Plan") wherein he stated that he "believe[d] he [was] current on all domestic support obligations that were due after the filing date of his chapter 13 plan."  (Mod. of Ch. 13 Plan, Mar. 22, 2011, ECF No. 210.)  That statement is the only substantive term of the Third Modified Plan; all other provisions of the plan remained the same.  Apparently, this representation was the last impediment to confirmation.  The court entered its *Order Confirming Chapter 13* on April 6, 2011.  (Debtor's Ex. 38.)

### 3.  Payments Under the Plan

As noted above, the debtor converted his case to a Chapter 13 on July 1, 2008. Commencing August 19, 2008, the debtor made three payments of $100 each to the trustee for the months of August, September, and October.  (Debtor's Ex. 39 at 2.)  Beginning November 18, 2008, he began making monthly payments of $465, which continued on a timely basis through February 21, 2013. (Debtor's Ex. 39.)

Daves, on Stephens's behalf, filed a proof of claim on March 10, 2009, in the aggregate amount of $25,840. (Debtor's Ex. 27 at 1.)  This amount is not broken down between attorney's fees, restitution, or alimony, although the Decree is attached.  As outlined above, the $9300 amount included $8800 in alimony accrued postpetition.  The balance of the claim presumably included $2350 in restitution and attorney's fees of $10,890.  Stephens, however, characterized the entire claim as one for domestic support obligations under 11 U.S.C. § 507(a)(1)(A), a section reserved for *prepetition* domestic support obligations.  That section might apply to the

9

prepetition restitution and attorney's fee award but would not include the postpetition alimony payments more accurately scheduled as a monthly expense on Schedule J.

On April 21, 2009, the debtor filed an *Objection to Proof of Claim* objecting only to the accuracy of the amount owed.  (Debtor's Ex. 28.)  Daves filed her motion to withdraw as counsel for Stephens on July 3, 2009.  (Mot. for Order Allowing Counsel to Withdraw as Atty. of Record, July 3, 2009, ECF No. 153.)  Daves's motion was granted by an order entered July 6, 2009.  (Order, July 6, 2009, ECF No. 155.)  By its order dated July 29, 2009, the court sustained the objection and gave Stephens thirty days within which to file an amended claim reflecting a priority claim of $21,440.  (Debtor's Ex. 33.)  Stephens filed her amended claim on July 30, 2009.  (Debtor's Ex. 34.)  There is no breakdown on this claim either.[3]

The trustee distributed an initial lump sum payment of $13,359.40 to Stephens on May 1, 2011, followed by monthly payments thereafter.  (Debtor's Ex. 40 at 2.)  Through March 1, 2013, the trustee's office distributed $20,919.24 to Stephens, leaving a balance of $520.76 on her claim amount of $21,440.  The trustee's monthly payments to Stephens ranged from $397.36 to $437.10, thus nearly exhausting the debtor's $465 monthly plan payment.  The trustee's office characterized the alimony as an arrearage in its internal documentation, which states:  "ATTY FEES/*ALIMONY ARRG*/CHILD SUPPORT ARRG AMD 08/09."  (Debtor's Ex. 40.) (emphasis added).

---

[3] The original claim was for $25,840.  Alimony of $9300, restitution of $2350, and attorney's fees of $10,890 equal $22,540.  The $3300 difference between the two totals may represent three additional months of alimony at $1100 each.  The amended claim of $21,440 represents, without explanation, a deduction of $1100 from $22,540.  Accordingly, the record is not entirely clear as to the exact amount of the postpetition alimony accrual.  Possibly, there were eight months of alimony postpetition, which would equal $8800.  Adding $500, the balance of arguably prepetition alimony outstanding after application of the $5000 bond placed by the debtor's parents, results in a balance of $9300.  Regardless if the actual figure is $9300 or $8800, clearly postpetition alimony accrued that the debtor did not pay directly to Stephens and that he included in his Modified Plan.

*C. The Circuit Court Action*

Judge Hearnsberger entered the Decree granting the Youngs' divorce on November 1, 2007. (Debtor's Ex. 41.) As stated above, the Decree ordered the debtor to pay Stephens alimony, attorney's fees, and restitution. (Debtor's Ex. 41.) The debtor appealed those three amounts. The Arkansas Court of Appeals affirmed the lower court. (Debtor's Ex. 43 at 6.)

Shortly after the Appellate Ruling, Stephens sent her October 6, 2008 demand letter to the debtor. (Debtor's Ex. 44.) At this point, Stephens had already obtained the Stay Order and filed her August 21, 2008 objection to his initial plan. After outlining the debtor's arrearages, Stephens advised in her letter that she needed assurances that she would receive payment by the end of the month or she would file contempt charges against the debtor. (Debtor's Ex. 44 at 1.) Soon thereafter, the debtor filed his Modified Plan to which Stephens objected.

Stephens was not satisfied with the debtor's response to her October 6 demand letter. On November 12, 2008, she filed her *Petition for Order to Show Cause, for Renewed Alimony, for Contempt, Attorney's Fees and Other Relief* ("Petition") in the Circuit Court. (Debtor's Ex. 45.) The Petition asked that the debtor "be held in contempt and punished accordingly" for his past due alimony, attorney's fees, and restitution. (Debtor's Ex. 45 at 2.) Stephens consulted with and acted on the advice of both Daves and her state court attorney, Michael Crawford ("Crawford"), before filing the Petition. Two hearings resulted from the Petition: the first on December 11, 2008, and the second on March 9, 2009.

### 1. December 11, 2008 Hearing

The debtor appeared pro se. Although frequently referenced, Cruz did not appear on his behalf. Crawford appeared for Stephens.[4]

---

[4] The debtor introduced a transcript of the December 11 hearing into evidence. (Debtor's Ex. 46.)

Crawford conceded that he was not a bankruptcy attorney.  (Debtor's Ex. 46 at 117.)  The proceeding reflected the difficulties inherent in reconciling a bankruptcy; a proposed but unconfirmed plan; a prepetition judgment for attorney's fees and restitution; consistent but undistributed payments to a trustee; a broad order lifting stay; and contempt for failure to pay alimony and attorney's fees.  The debtor's Schedule J and Modified Plan further complicated matters.  The debtor's Schedule J reflected postpetition alimony as a monthly expense, which the debtor was not paying.  The proposed but unconfirmed Modified Plan provided for the same postpetition alimony on an extended, pro rata basis and "continue[d]" monthly payments that the debtor had not and did not make.  (Debtor's Ex. 12 at 1.)

In his opening, Crawford informed the Circuit Court that he needed some findings of fact that Cruz "indicated would be helpful to her to get a resolution in the Bankruptcy Court." (Debtor's Ex. 46 at 71.)  Crawford acknowledged the bankruptcy and advised the Circuit Court of the Stay Order.  Then, he stated that if it was "proper to proceed, then I'm gonna ask the matter be reset in sixty days so that we can make the determination of whether the [Circuit] Court should enforce what it determines today or if the Bankruptcy Court orders that we're stayed on all matters, then we'll certainly have to recognize that."  (Debtor's Ex. 46 at 71.)

Crawford informed the court that he had been in contact with Cruz and understood that there was a hearing set "next Wednesday" to address the debtor's plan and Stephens's objection. (Debtor's Ex. 46 at 117.)  The Circuit Court hearing occurred on December 11, 2008, but the docket in the bankruptcy case does not reflect a plan confirmation hearing, or any other hearing in the debtor's case, scheduled in December 2008.  A confirmation hearing scheduled for November 19, 2008, was continued to January 21, 2009.  (Debtor's Ex. 1.)

Crawford introduced a copy of the debtor's Modified Plan that "Ms. Cruz provided . . . yesterday." (Debtor's Ex. 46 at 105.) The Modified Plan outlined a priority debt to Stephens in the amount of $9300 for past due alimony, which was to be paid in full during the life of the plan. (Debtor's Ex. 12.)

Crawford stated that he was "asking the bankruptcy attorneys to go to that Court and get some determination as to what, if any, the impact of that stay has." (Debtor's Ex. 46 at 118.) Accordingly, Crawford asked the Circuit Court to "make findings that I can put in an Order to give the Bankruptcy Court so they can understand what it is [the debtor] owes and also make a determination how [the Circuit] Court, if it can, proceeds to secure those funds." (Debtor's Ex. 46 at 118.) Stephens testified that, failing an adverse determination from the bankruptcy court during the proposed abeyance period, an arrest warrant should be issued for the debtor's failure to pay alimony. (Debtor's Ex. 46 at 86−87.)

The Circuit Court found the debtor in contempt of court for his failure to pay the past due alimony and attorney's fees. Not readily apparent is whether the Circuit Court made any independent determination of contempt other than that requested by Stephens in her Petition. The Circuit Court then stated that it would hold the contempt order in abeyance "to allow [the debtor] to go into Bankruptcy Court and to make the arguments to the Bankruptcy Judge in light of [the Circuit] Court's Orders . . . ." (Debtor's Ex. 46 at 120.)

The debtor conferred with Cruz after the hearing; she advised him that the stay still protected him. She also explained to the debtor that the stay was not a piece of paper but a statute. She did not take any further steps to protect the debtor.

13

After the hearing, Judge Hearnsberger entered her *Order of Support and Contempt* ("Contempt Order") on December 16, 2008. [5] (Debtor's Ex. 48.)  In the Contempt Order, Judge Hearnsberger quoted from the Stay Order and found that Stephens could "proceed with issues of support and attorney's fees arising from support together with any contempt which arises from the [debtor's] failure to comply with previous Orders of this Court."  (Debtor's Ex. 48 at 1.)  Judge Hearnsberger also stayed the order for sixty days to allow the debtor to secure "any Order that he may see fit."  (Debtor's Ex. 48 at 2.)  However, if no stay was entered by the "US Bankruptcy Court," then the debtor was to comply with the provisions of the Contempt Order. (Debtor's Ex. 48 at 2.)  The Contempt Order held the debtor in willful contempt of the Circuit Court's previous orders relative to alimony and attorney's fees but reserved the issue of restitution "subject to the US Bankruptcy Court decisions concerning the current plan pending by [the debtor]."  (Debtor's Ex. 48 at 3.)  The court also granted Stephens reduced alimony of $800 a month for a year beginning January 15, 2009.  (Debtor's Ex. 48 at 3.)  The debtor made, by a money order from his parents, only one $800 payment, plus an additional $75 payment, against this alimony award.

In conclusion, the Contempt Order provided that "in the event the [debtor] failed to secure a stay from the US Bankruptcy Court," by March 1, 2009, he must post a bond for the past due alimony and attorney's fees or surrender to the Garland County Sheriff's Department. (Debtor's Ex. 48 at 4.)

---

[5] Neither party argued that the Circuit Court's Contempt Order included criminal contempt. Accordingly, this opinion deals solely with civil contempt charges resulting directly from Stephens's Petition.

2. March 9, 2009 Hearing

The debtor did not post a bond or surrender to the Garland County Sheriff's Department by March 1, 2009.  Accordingly, Judge Hearnsberger, at Stephens's request, convened a second hearing on March 9, 2009.  By then, Daves had, at the January 21, 2009 confirmation hearing, voluntarily withdrawn Stephens's October 31, 2008 objection to the Modified Plan.  (Debtor's Ex. 21.)  Stephens's withdrawal of her objection did not, however, result in confirmation because the trustee still had a pending objection to the debtor's plan.

The debtor once again appeared pro se before Judge Hearnsberger.  Again, although he made frequent references to his bankruptcy attorney, Cruz did not appear.

The debtor made two principal arguments.  First, he argued that he was making all of his payments to the trustee, and those funds were available to pay Stephens once she filed a proof of claim.  (Debtor's Ex. 46 at 125−26.)  This is an argument Cruz later repeated in the Complaint: "At the hearing on March 9, 2009, [the debtor's] plan in bankruptcy was still not confirmed, [Stephens] still had not been paid because [Stephens] had failed to file a Proof of Claim, and had continued to object to confirmation."  (Compl. 5, Jan. 5, 2011, AP ECF No. 3.)  The debtor's representations to the Circuit Court, repeated in his Complaint, are, however, incorrect insofar as alimony is concerned.  The debtor's Schedule J and his proposed but unconfirmed plans all contemplated him making his alimony payments directly to Stephens; the money with the trustee represented his disposable income calculation and was for his prepetition debt, which included other creditors.  Stephens may have been entitled to a pro rata distribution with other creditors based on her prepetition judgment for attorney's fees and restitution but not her postpetition alimony.  Stephens had no need to file a proof of claim for the ongoing Schedule J alimony expense.  Also, Stephens did not have an objection pending on March 9, 2009; the only

15

remaining impediment to confirmation was the trustee's objection, which included as a basis the debtor's failure to provide proof that he was paying his postpetition domestic support obligations.

Second, the debtor argued that, based on his conversations with Cruz, the stay remained in effect, and he should not have had the burden placed on him to get an order from the bankruptcy court confirming its continued existence.  (Debtor's Ex. 46 at 124-25.)

Crawford argued on Stephens's behalf that, while she never "wished [for the debtor] to be incarcerated[,] [s]he simply want[ed] him to make payments on these amounts."  (Debtor's Ex. 46 at 133.)  Crawford also incorrectly stated that a claim had been filed in the bankruptcy case.  (Debtor's Ex. 46 at 128.)  Daves actually filed a proof of claim for Stephens the next day, March 10, 2009.  (Debtor's Ex. 27.)

As a result of the March 9, 2009 hearing, Judge Hearnsberger immediately jailed the debtor and subsequently entered her *Order for Contempt* on March 27, 2009.[6]  (Debtor's Ex. 50.)  The Order for Contempt found that the debtor had taken no steps to purge himself of the previous contempt and had made no payments on attorney's fees or past due alimony "despite representations by the [debtor] that such payments are current and being made by the bankruptcy proceeding."  (Debtor's Ex. 50 at 1.)  The Circuit Court ordered the debtor to be incarcerated for thirty days or until such time as he posted a bond in the amount of $8200.  (Debtor's Ex. 50 at 2.)  The debtor testified that his stay in jail was not pleasant.

The debtor appealed the December 16, 2008 and March 27, 2009 contempt orders.  In his appeal, he specifically argued that the trial court "impermissibly shifted the burden to him to

---

[6] Stephens did not raise or characterize this Order for Contempt as criminal. For purposes of this opinion, this court treats the contempt as civil specifically resulting from Stephens's request as set forth in her pleadings filed in Circuit Court.

16

prove that the proceeding violated the automatic stay" and that the orders "were void ab initio."

(Stephens's Ex. 3.)  The Arkansas Court of Appeals dismissed the appeal as moot in its opinion

delivered March 17, 2010.  (Stephens's Ex. 3.)  The Court of Appeals specifically stated:

> In deciding that this case is moot, we note that [Stephens's] circuit court attorney introduced into evidence an order of the bankruptcy court that stated unequivocally that the automatic stay was lifted. It stated in pertinent part:
>
> > The Motion for Relief from Stay is granted for the purpose of allowing the parties to file pleadings with the Arkansas Court of Appeals or to seek state court remedies that are not inconsistent with any ruling issued by the Arkansas Court of Appeals in the underlying Circuit Court proceeding. This Order shall continue in effect should the Debtor convert his case to a Chapter 13 Bankruptcy.
>
> > We note that [the debtor's] appellate attorney, who is also his bankruptcy attorney, placed in the record certain bankruptcy-court documents as well as a transcript from the hearing wherein the relief-from-the-stay motion was presented. These documents were not presented to the circuit court, therefore, placing them in the abstract and addendum violates Arkansas Supreme Court Rule 4–2. While it may be true that these documents seem to cast doubt about whether the order lifting the stay accurately reflects the intention of the bankruptcy judge, we will not consider them in this appeal.

(Stephens's Ex. 3 at 2.)

Finding no relief in state court, the debtor filed this adversary proceeding on December

30, 2010, almost two years after his incarceration.

### D.  Damages

The debtor alleges that he "suffered severe medical and emotional consequences from the

numerous attempts to collect" the domestic support obligations.  (Compl. 7, Jan. 5, 2011, AP

ECF No. 3.)  He also contends that he lost salary during his second incarceration plus

prospective wages and benefits from a full time position with the United States Postal Service

("Postal Service").  During the trial, the debtor produced no evidence of medical or emotional

consequences other than the inherent unpleasantness of a stay in jail.  Further, the debtor did not

17

introduce any evidence of lost income during his incarceration.  He did, however, present evidence regarding the Postal Service job.

The debtor is a massage therapist.  He testified that his work diminished as a result of his incarceration and commensurate loss of client trust.  Unclear is whether his prepetition incarceration contributed to that lost trust.   Additionally, the debtor acknowledged that his income may have suffered from rumors that he was sleeping with some of his clients.

The debtor testified that he looked for and obtained a night shift position with the Postal Service but contends that his incarceration resulted in him losing that job.  By letter dated March 13, 2009, the Hot Springs, Arkansas Postmaster, Danny Phillips ("Phillips"), informed the debtor that the position had been awarded to another applicant due to the debtor's failure to complete necessary paperwork at a meeting scheduled for March 11, 2009.  (Debtor's Ex. 53.)  The debtor missed the meeting solely because of his incarceration.

The non-career Postal Service job mirrored one the debtor previously had with the Postal Service.  The debtor left the earlier job because he did not want to work on Sundays.  But the new position would have also required him to work on Sundays.  Pay was to be hourly, but Phillips was uncertain of the exact hourly rate.  It may have been approximately $12–$13 an hour.  The debtor might average, but was not guaranteed, forty hours a week.  He would receive no fringe benefits, such as health insurance or retirement.  According to Phillips, on previous occasions, a successful applicant had been denied a job due to the paperwork that the debtor was unable to complete.  Although the Postal Service advertised similar job openings after March 2009, the debtor did not apply.  The debtor did, however, gain employment elsewhere; a six month stint as a teacher proved too stressful.  Amid criticism from his employer, he quit.

An expert, Dr. Charles Venus ("Venus"), testified on the debtor's behalf concerning damages. Venus calculated, solely in the context of the Postal Service job, a total lost income, including fringe benefits, of $138,880 for a four year period commencing March 2009. (Debtor's Ex. 55.) The debtor presented no evidence that he would have been gainfully employed for a four year period. Venus's calculations did not take into account any mitigation or deduction based on the debtor's actual employment and income history from March 2009 through the date of the hearing in April 2013. The highest projected income figure postulated by Venus, $26,487 in year four, is actually less than the debtor's amended Schedule I gross monthly income of $3700, or $44,400 a year, which formed the income stream from which the debtor made his plan payments through 2013. Venus acknowledged that his calculations had to be reduced because the job did not carry fringe benefits. Further, Venus did not take into account the Appellate Ruling that affirmed the Circuit Court's finding that the debtor had the ability to earn $5000 per month, noting a broad range of proof of anywhere from $24,000 to $85,000 a year. Given that range, the appellate court determined that a $5000 a month basis for calculating alimony was not clearly erroneous. (Debtor's Ex. 43 at 2.)

### III. Discussion

The debtor seeks damages for willful violation of the automatic stay and an injunction directing Stephens to cease collection efforts based on the Stay Order. The debtor did not introduce evidence sufficient to warrant injunctive relief. Relief in the form of nominal damages is appropriate as relates to the automatic stay.

The parties to this adversary proceeding focused on a poorly worded Stay Order, which Stephens argued fully justified her pursuit of the debtor. However, focusing on the Stay Order belies the fact that both the debtor and Stephens acted without regard to the Code's explicit

treatment of domestic support obligations.  Stephens completely ignored the panoply of rights

and remedies afforded an ex-spouse under the Code; the debtor persistently tried to address his

dilemma by proposing a plan directly contrary to the Code and his own Schedule J.

### A.  The Code's Treatment of Domestic Support Obligations

Divorce, unfortunately, is not a rare event, especially when bankruptcy impends or is

filed.  The dissolution of a marriage is a creature of state law.  Accordingly, the framers of the

Code sought to create an exclusive but complementary relationship between the incidents of a

divorce and the benefits of a bankruptcy.  This includes an explicit, comprehensive, and enviable

treatment scheme for the ex-spouse.  *See In re Andrews*, 434 B.R. 541, 545 (Bankr. W.D. Ark.

2010) (noting that "[c]laims that are domestic support obligations are accorded special treatment

under the Chapter 13 provisions of the Bankruptcy Code").  Stephens and the debtor, however,

individually and collectively disregarded this comprehensive scheme.

Alimony is one of the most important incidents of divorce.  Determining the appropriate

amount is based upon formulas and guidelines peculiar to the local state court.  Frequently, state

courts retain jurisdiction to modify alimony on an ongoing basis, which may include the

pendency of a bankruptcy proceeding.  The Code recognizes this necessity and expressly

exempts from the automatic stay "the establishment or modification of an order for domestic

support obligations."  11 U.S.C. § 362(b)(2)(A)(ii) (2013).

A domestic support obligation can become payable "before, on, or after" the filing of the

petition.  11 U.S.C. § 101(14A) (2013).  As a result, some obligations are due prepetition while

others become due postpetition.  The Code treats each differently.

A Chapter 13 debtor, temporarily freed of his other debt obligations and required to pay

alimony on a calculus based on his income and expenses, must pay his postpetition alimony as

20

an ongoing expense.  In fact, "failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition" is a basis for conversion or dismissal of the bankruptcy case.  11 U.S.C. § 1307(c)(11) (2013).

Section 1325(b) contemplates that a debtor, while formulating a plan, must remain current on his postpetition domestic support obligations.  This section requires a debtor to propose a plan that provides "that all of the debtor's projected disposable income to be received [during the plan period] will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B) (2013).  Disposable income is defined as "current monthly income received by the debtor . . . *less* amounts reasonably necessary to be expended–for the maintenance or support of the debtor or a dependent of the debtor, or for a *domestic support obligation*, that first becomes payable *after the date the petition is filed*[.]" 11 U.S.C. § 1325(b)(2)(A)(i) (2013) (emphasis added).  Thus, the debtor deducts postpetition domestic support payments from his monthly income to determine how much disposable income he will have to distribute to his unsecured creditors.  This expense is generally expressed on his Schedule J.  Accordingly, the debtor should be paying his postpetition domestic support obligations as a separate monthly expense.

In fact, the Code does not even permit the filing of a proof of claim for postpetition domestic support obligations.  *Burnett v. Burnett* (*In re Burnett*), 646 F.3d 575, 582 (8th Cir. 2011) (citing 11 U.S.C. § 502(b)(5)).  Section 502(b)(5) disallows any claim "to the extent that . . . such claim is for a debt that is unmatured on the date of the filing of the petition and is excepted from discharge under section 523(a)(5) of this title[.]"[7]  11 U.S.C. § 502(b)(5) (2013).  Because postpetition domestic support obligations are not part of the debt owed as of the

---

[7] Pursuant to section 523(a)(5), debts for a domestic support obligation, regardless of whether they accrue pre- or postpetition, are nondischargeable.

date of the petition, such debts qualify as unmatured.  See, e.g., *Burnett*, 646 F.3d at 582 (citing *Foster v. Bradbury* (*In re Foster*), 319 F.3d 495, 497 (9th Cir. 2003)).  Thus, a creditor cannot file a proof of claim for postpetition domestic support obligations.  "[T]o the extent [the debtor] ha[s] a continuing [postpetition] obligation to pay spousal support, [a] confirmed plan [cannot], and [does] not, affect that obligation."  *Burnett*, 646 F.3d at 582 (citation omitted).  Therefore, "a Chapter 13 debtor is required to maintain postpetition domestic support obligations on a current basis out of postpetition earnings or income, and such obligations should be reflected in the debtor's schedule of expenses."  8 Collier on Bankruptcy, §1300.71[3][e] (15th ed. 2005).

While a creditor cannot file a proof of claim for a postpetition domestic support obligation, the same does not hold true for a prepetition domestic support obligation.  Commensurate with paying his ongoing postpetition domestic support obligations as an expense, the debtor must address any prepetition domestic support arrearages through a plan that affords the ex-spouse priority under section 507(a)(1).  First priority status is given to "*[a]llowed* unsecured claims for domestic support obligations" that are owed or recoverable to a spouse or ex-spouse "*as of the date of the filing of the petition*."  11 U.S.C. § 507(a)(1)(A) (2013) (emphasis added).   Before a debtor can confirm a Chapter 13 plan, the plan must provide for the full payment, in deferred cash payments, of all prepetition domestic support obligations unless the holder of the claim agrees to a different treatment.  11 U.S.C. § 1322(a)(2) (2013); *Hall v. U.S.*, 132 S. Ct. 1882, 1889 (2012) (stating "[s]ection 1322(a)(2) . . . requires full payment of 'all claims entitled to priority under section 507' under the plan").  These sections make it clear that solely prepetition domestic support obligations should be paid through a debtor's Chapter 13 plan.

Although a debtor can pay a prepetition domestic support obligation through his plan, he must remain current on all postpetition domestic support obligations.  As a condition to plan confirmation, the debtor must demonstrate that he "has paid all amounts that are required to be paid under a domestic support obligation, and that first become payable *after the date of the filing of the petition* if the debtor is required by a judicial or administrative order . . . to pay such domestic support obligation[.]"  11 U.S.C. § 1325(a)(8) (2013) (emphasis added).  Given that plan confirmation is conditioned on paying all postpetition domestic support obligations and failure to pay such obligations can result in dismissal or conversion, "[i]t is evident that Congress requires a chapter 13 debtor to remain current on any domestic support obligation that first becomes payable postpetition."  *In re Wise*, 476 B.R. 653, 662–23 (Bankr. D.C. 2012).  Moreover, a debtor who has diligently completed all his payments under a properly confirmed plan must, as a condition to obtaining his discharge, certify that all postpetition domestic support obligation payments have been made.  11 U.S.C. § 1328(a) (2013).[8]

### B. Violation of the Automatic Stay

Both the debtor and Stephens ignored the Code's treatment of domestic support obligations.  The debtor's actions and the resulting show cause order are addressed below.  Stephens chose to aggressively pursue collection of domestic support obligations through contempt in Circuit Court.  In doing so, she willfully violated the automatic stay.

Once a debtor files his petition, most collection activities against him are automatically stayed.  11 U.S.C. § 362(a), (c)(2) (2013).  The automatic stay applies to all property of the estate until it ceases to be property of the estate and to the debtor until the case is closed or dismissed.  11 U.S.C. § 362(c)(1), (2) (2013).  Section 362(a) imposes an affirmative duty on a creditor to

---

[8] This section addresses payment of prepetition domestic support obligations "to the extent provided for by the plan."

cease actions that may violate the stay and requires the creditor to act affirmatively to reverse actions that would violate the stay. *See Walters v. Sherwood Mun. Ct.* (*In re Walters*), 219 B.R. 520, 526 (Bankr. W.D. Ark. 1998). A willful violation of the stay occurs when a creditor knew of the stay and a creditor's actions were intentional. *Id*. A creditor need not have a "specific intent to violate the automatic stay." *Id*; *See also Bateman v. Southern Development Corp.* (*In re Bateman*), 435 B.R. 600, 607 (Bankr. E.D. Ark. 2010) (citation omitted). A willful violation of the stay can result in actual damages, including costs and attorney's fees, as well as punitive damages "in appropriate circumstances." 11 U.S.C. § 362(k)(1) (2013).

Stephens willfully violated the automatic stay by pursuing collection of prepetition attorney's fees and restitution through her coercive Petition for contempt that led to the debtor's incarceration; she included postpetition alimony in the same effort. Stephens had a full array of remedies under the Code. Her remedies with respect to prepetition attorney's fees and restitution were to (1) assert her claim and commensurate priority in a properly filed and allowed proof of claim and (2) object to any plan that treated her claim otherwise. Her remedies for the debtor's failure to pay postpetition alimony were to (1) object to confirmation of his plan under section 1325(a)(8) or (2) move for conversion or dismissal under section 1307(c)(11). Dismissal or conversion would have left the debtor fully responsible for his domestic support obligations.

Stephens's reliance on the Stay Order as a complete defense is misplaced. Evidently, both Stephens and the debtor were poorly served by the confusing Stay Order that was drafted and approved with language contrary to the parties' collective representations to Judge Barry. While the confusing language suggests a mitigation of willfulness, the Stay Order does not alter the Code's integrated treatment of domestic support obligations and the inappropriateness of pursuing, through coercive contempt, the collection of prepetition debt. This is especially true

when, at the same time, Stephens was withdrawing her objection to a plan that provided for payment of the same specific amount.[9]

The suspect language in the Stay Order is actually amenable to an interpretation consistent with the Code.  The Stay Order provides:

> Accordingly, it is hereby Ordered that the Motion for Relief from Stay is granted for the purpose of allowing the parties to file pleadings with the Arkansas Court of Appeals or to seek state court remedies that are not inconsistent with any ruling issued by the Arkansas Court of Appeals in the underlying Circuit Court proceeding.

(Debtor's Ex. 7).   This language would have sanctioned an adjustment of the attorney's fee, alimony, or restitution awards in the Circuit Court proceeding had the debtor been partially or fully successful in his appeal.  Section 362(b)(2)(A)(ii) anticipates just such an event.  Nothing in the Stay Order suggests a complete abnegation of the debtor's entire bankruptcy solely for Stephens's benefit.  Stephens ignored the comprehensive relief available to her under the Code merely to coerce payment of her debt through civil contempt, all to the detriment of the debtor and his effort to reorganize both for his and his creditors' benefit.

Further, the stay is by operation of law; other than perhaps through an adversary proceeding for declaratory relief, no basis exists for a debtor to go back to the bankruptcy court in a sixty day window and obtain an advisory opinion as to the application of the automatic stay. The Circuit Court inappropriately placed that burden on the debtor.

### C.  Order to Show Cause

Stephens willfully violated the automatic stay, and damages, if proven, should result. This does not, however, conclude the court's inquiry.  Stephens conflated pre-and postpetition

---

[9] The debtor could have properly provided for Stephens's allowed claim for prepetition attorney's fees and restitution in his plan.  The inclusion of postpetition alimony in his plan was improper.

25

domestic support obligations by seeking contempt, denying confirmation of the debtor's plan, and filing a proof of claim asserting an administrative priority under section 507(a)(1). Conversely, when it benefited him, the debtor willingly reciprocated. In doing so, the debtor ignored the Code's statutory scheme for the treatment of domestic support obligations to the detriment of his other unsecured creditors. To that end, the debtor made misstatements to the Circuit Court. Further, he may have deceived his other creditors, the trustee, and this court.

The debtor filed bankruptcy while current in his monthly alimony payments as a result of his parents posting a $5000 bond prepetition.[10] Despite listing the $1100 monthly alimony expense on his Schedule J, the debtor did not make those payments. Presuming that the debtor accurately listed his expenses and income, each month $1100 was unaccounted for as either an alimony payment or as an addition to his disposable income calculation.

The debtor then sought to amend his plan to improperly add the postpetition accrued alimony that he failed to pay as a monthly expense. The debtor did not, however, ever increase his plan payments by $1100[11] to make this payment. The $465 disposable income calculation was based on the debtor having already paid or allocated $1100 a month towards alimony; the $465 disposable income calculation was for the debtor's other creditors, inclusive of any prepetition domestic support obligations.

The debtor told the Circuit Court that all Stephens had to do was file a proof of claim and she would be paid. Presuming eventual confirmation, his statement may have been true with respect to the prepetition judgment for attorney's fees and restitution; however, it was never true with respect to the postpetition accruals of alimony. The debtor unquestionably knew at both

---

[10] As suggested in footnote 3 above, $500 in alimony may have been due when the debtor filed his petition.
[11] Or later, $800 in reduced alimony.

Circuit Court hearings that he had not paid his alimony, which he listed as an ongoing Schedule J expense. As discussed above, the Code does not permit Stephens to file a proof of claim for postpetition alimony. Further, confirmation of the debtor's plan was conditioned on him being current on his postpetition alimony.

After a delay of over two years, from January 2009 to April 2011, the debtor exacerbated his problems when he finally secured confirmation of his plan by representing to the bankruptcy court that he had paid his postpetition alimony. In fact, he had not. This representation directly resulted in distributions to Stephens from funds held by the trustee that actually should have gone to his other creditors. The certification may have been interposed for the improper purpose of circumventing section 1325(a)(8) to obtain confirmation. The debtor's certification, found in the Third Modified Plan, that he "believe[d] he [was] current on all domestic support obligations that were due after the filing date of his chapter 13 plan," may have violated Federal Rule of Bankruptcy Procedure 9011. (Mod. of Ch. 13 Plan, Mar. 22, 2011, ECF No. 210.) This certification as well as the conduct of Cruz and the debtor outlined herein form the basis of a contemporaneous order to show cause issued on both Cruz and the debtor.

### D.  Damages

 Regardless of the debtor's conduct, Stephens chose to ignore the remedies readily available under the Code; rather, she willfully violated the stay in pursuing coercive contempt against the debtor for prepetition debt. The debtor is entitled to $250 in nominal damages and an attorney's fee of $500. Two factors compel this result.

First, the debtor did not demonstrate any actual damages. "The party seeking damages for a [willful] stay violation must establish that: '(1) a violation occurred; (2) the violation was committed willfully, [and] (3) the violation caused *actual* damages.'" *Bateman*, 435 B.R. at 607

(citations omitted) (emphasis added).  The debtor did not introduce any evidence of actual damages incurred during his incarceration.  The debtor's entire damage claim rested on the premise that his incarceration cost him the Postal Service job.

To accept the debtor's prospective damage claim, the court would have to conclude that (1) his previous incarceration had no effect on his massage therapy business; (2) the rumors of him sleeping with clients had no effect on his business; (3) the debtor was assured of the Postal Service job despite the fact that he had not completed necessary, and at times prohibitive, paperwork; (4) the debtor would have stayed four years on a job that he previously quit because he did not want to work on Sundays; and (5) that no other night jobs were available during the entire four year period, including at least one other similar job posting with the Postal Service that the debtor ignored.

Venus, the debtor's expert, calculated, solely in the context of the Postal Service job, a total lost income, including fringe benefits, of $138,880 for a four year period commencing March 2009.  (Debtor's Ex. 55.)  These calculations are flawed for a number of reasons.  The debtor might average, but was not guaranteed, forty hours a week.  The position provided no fringe benefits.  In his calculations, Venus gave no consideration to the debtor's actual employment and income history from March 2009 through April 2013.  Venus also did not consider the Appellate Ruling, which affirmed the Circuit Court's finding that the debtor had the ability to earn $5000 a month.  Furthermore, the highest projected income figure postulated by Venus actually totals less than the figure listed as the debtor's gross monthly income on his Schedule I.  The debtor did not present sufficient evidence that he did not or could not make a living equal to or better than the speculative Postal Service job after his incarceration.  In fact, all the evidence, including his Schedule I, suggests otherwise.

28

Second, Cruz contributed significantly to the debtor's eventual circumstances through her approval of a broad Stay Order that contained language previously disconcerting to Cruz, as expressed in the Response she filed to the original Stay Motion. Also, she had at least two opportunities to address and prevent the debtor's incarceration. First, she reacted to Stephens October 6, 2008 demand letter and threat of contempt not by interposing the existence of the automatic stay, but by immediately amending the debtor's schedules and plan to inappropriately include postpetition alimony. Second, while the burden should not have shifted to the debtor to prove the stay after the December 11, 2008 hearing, Cruz failed to take any steps whatsoever to protect the debtor.

Additionally, Cruz filed the debtor's Third Modified Plan, which may have falsely represented that the debtor had paid his postpetition alimony. Cruz's contributions to the debtor's troubles, and perhaps her own misrepresentations to this court, dictate a nominal award of attorney's fees. This award may be reconsidered based on the evidence produced at the show cause hearing.

## IV. Conclusion

The relief requested in the Complaint is granted with respect to the allegations concerning a willful violation of the automatic stay. The debtor is awarded $250 in nominal damages and $500 in attorney's fees and costs. The debtor did not produce sufficient evidence to warrant the imposition of an injunction. Accordingly, that relief is denied. A separate judgment will be entered to this effect. Further, a separate order to show cause will issue directing Cruz to show cause why she should not be sanctioned pursuant to Federal Rule of Bankruptcy Procedure 9011 and directing the debtor to show cause why his case should not be dismissed for cause pursuant to 11 U.S.C. § 1307, including section 1307(c)(11).

29

IT IS SO ORDERED.

Dated this 10th day of June, 2013.

_____

RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:     Jonathan Young, Debtor
        Kathy A. Cruz, Attorney for Debtor
        Annabelle Lee Patterson, Attorney for Debtor
        Kristalynn Stephens, Defendant
        Marc Honey, Attorney for Defendant
        Jack W. Gooding, Trustee